The argument is V.M. v. Garland and counsel are both here in person. Ms. Bradley, whenever you're ready, please proceed. Good morning, and may it please the Court. My name is Liz Bradley. I'm counsel for petitioner. I would like to reserve three minutes of my time, and I will watch my clock. Thank you. Today I'd like to discuss three issues regarding the Board's erroneous denial of Mr. V.M.'s CAT claim. First, the expert witness. Second, the aggregate risk analysis. And third, credibility. Each of these issues, at a minimum, require remand in light of recent precedent of Alaska-Samoa and Elam. On the expert, even if we completely discount Mr. V.M.'s testimony, everything he said, Dr. Slack, the expert witness, found that based on his objective characteristics alone, his torture by cartels in the future is highly likely, and his torture by police in the future is extremely likely. Now, the parties agree that the agency is not required to credit expert testimony as fact. But, under Velasco-Samoa, and previously under Castillo, when the agency gives limited weight to expert opinion, it has to give a cogent explanation for why. Here, the agency found Dr. Slack was a credible expert witness, and his methodology was an adequate basis to support his opinion. They just disagreed with his opinion, but didn't give a valid basis for why. The Board at AR-9 only gave two reasons to give limited weight to Dr. Slack's opinion. First, it said that his predictive opinion was a legal conclusion he was not authorized to give. The government does not even attempt to support this position. Experts clearly can give predictive opinions. That's supported by this court's case in Cole, and the Board's own precedent in matter of JGT. Second, they said that Dr. Slack is not an expert on acquiescence, but that's irrelevant, because Dr. Slack never purported to be an expert on acquiescence, or opine on torture in any legal sense. He merely gave a predictive opinion of what he thought was likely to happen in the future. If we look beyond the Board's decision to the immigration judge, this is a case where the immigration judge said that in light of other record evidence, she just didn't find Dr. Slack's testimony persuasive. But as was the problem in Velasquez, Samoa, and Cole, she didn't cite to anything in the record that actually contradicted or outweighed Dr. Slack's testimony. And careful review of the country conditions and the immigration judge's own observations actually corroborate Dr. Slack's testimony. And that's laid out in our opening brief at pages 51 and 52. So because the agency gave no cogent reason for giving limited weight to his testimony, Velasquez, Samoa, and previously Castillo, instructed the court at a minimum has to remand with instructions to give the expert full weight, or give better reasons why. Israeli, could I have you switch gears for a moment to something that is concerning me? And that is, to what extent do you think the Board gave adequate consideration to VM's mental diagnoses and crises moments in making its adverse credibility determinations? As I looked over the record and I see that there was quite a bit of weight given to statements he made at the border in 2014 and 2015 and in July and August that proceeded very close in time to suicide attempts. Was the Board required to give some consideration to the reliability of those statements or to weigh those statements in the context of what he was diagnosed with and having been found incompetent and needing to have counsel during these proceedings? So that was one of the issues with both the immigration judge and the Board. They seemed to just forget that he was found legally incompetent and mentally disabled. That issue was fully briefed to the Board as well and they just disregarded or glossed over it. In looking at his statements at the border, though it was argued and there was evidence obviously of his mental illness having a severe psychotic episode right around those times, the immigration judge seemed to go out of her way to completely ignore that evidence. She cited seven times his physical injuries and visible injuries and did not once mention his mental disability when considering his border interview. And the Board similarly just seems to gloss over that, which is one of the errors in his credibility determination. So following up on that, what should the Board have done or the immigration judge have done in making that adverse credibility determination? In other words, should we say that to consider the totality of the circumstances, the judge must consider the mental health diagnoses in the context of the statements when they were made? Is that part of the totality analysis that should be considered? Yes, absolutely. And that even goes back to Shrestha. I don't think I said that case name right. But they said you must consider the individualized circumstances of the individual as part and parcel of the credibility determination. And failure to do so is an error. I'd like to discuss aggregate risk a little bit, and then we will get back to credibility. On the aggregate risk, this is also an area where Velasquez-Samoya largely resolves this issue. There, the court said very recently that a matter-of-JFF string-of-events analysis is really only applicable when there's a single source of torture. When there's multiple sources of torture, as there are here, JFF has really no role. Instead, you just aggregate the risk of torture from all sources and for all reasons. Now, the government argues that it's still okay to use matter-of-JFF in assessing each source of torture as long as you then aggregate the risk. That's not what Velasquez-Samoya says. But even if it were, the way the agency used matter-of-JFF in this case was wrong for two reasons. One, the immigration judge repeatedly used matter-of-JFF in a way that she artificially invented her own string of hypothetical events, which she thought could potentially lead to torture. But in doing so, she limited the scope of evidence she was willing to consider and only considered some scenarios of torture to the exclusion of others. There's multiple examples of this, but one clear example is the unnecessary insertion of the modifier arbitrary for arbitrary detention. Both the immigration judge and the board only considered his risk of torture by Mexican officials in the context of arbitrary detention. But the country conditions and even evidence about what happened in the Aquiles-Sedan prison show that torture in Mexico also happens in the context of lawful detention. And murder, which is torture, requires no detention at all. So is it your view that the IJ might have come up with more than 50% on those individual categories had she considered the non-arbitrary detentions as well? There was multiple ways she did that. So first she used JFF to kind of limit the scope of each of her strings of assessments for each source of torture. And then she made another error when she tried to then aggregate those risks. First I'll talk about the strings and kind of what happened there and then the aggregation. So in the strings, she considered only scenarios of torture, excluded other evidence. A similar error happened actually in Haley v. Holder, where the court looked at how the agency used META or JFF and said they used it in a way that ignored some record evidence. And that just violates the regulations, because the regulations require consideration of all evidence relevant to the possibility of future torture. So if you use META or JFF in a way that ignores some record evidence, that just violates the regulations. But even with these artificially narrow strings that the judge created, she used one to completely discount one source of torture, the mental health claim, and then with the other three, she still found some risk of torture by three independent sources, Mexican government officials, the Sinaloa cartel, and other cartels. But then when the immigration judge tried to aggregate those three strings, she did an either-or analysis and said that he could not carry his burden of proof because he couldn't show that each string in each hypothetical chain was not more likely than not to occur. And that was wrong even under the pre-Velasco-Samoa standards. So with this watered-down analysis, still finding some risk. And at some point, some risk, some risk, and some risk, when properly aggregated together, if you actually look at all sources of torture and all reasons of torture, needs to pass the more likely than not threshold in the aggregate. And here, so at a minimum, Velasco-Samoa does require a remand, because the matter of JFF analysis really just infected the whole analysis in this case. Turning to credibility, here the court's recent decision in Alam also at least requires a remand for the reconsideration of his credibility under the totality of the circumstances. This case was adjudicated pre-Alam. But here what we have is the immigration judge found that Mr. VM gave consistent, specific, and detailed testimony about his past harms. Who harmed him, where he was harmed, including finite details of the instruments used to harm him. And that's at AR 152. We also have uncontested, objective evidence that Mr. VM was in a Mexican prison when officials came in, stripped and whipped hundreds of prisoners indiscriminately, entire cell blocks, in an effort to coerce information about gang violence in the prison. And it's uncontested, everyone agrees, Mr. VM's specific tattoos make him look like a gang member. The immigration judge discounted this consistent and corroborated testimony based on completely ancillary factors. We identified 10 factors, the government actually only addresses 8 of them. None of those factors identified are actually about his claim of torture. Most of them focus on how Mr. VM, a person who's mentally disabled, does not act, how the immigration judge or the board thinks he should act or should have acted in certain situations. And both the board and the immigration judge conceded that many factors are not particularly strong and on their own would not be sufficient. And as we laid out in our briefs, most of the factors contain factual or legal errors, misstatements or speculation. So under Kumar, which came out after Alam and kind of applied the Alam analysis, what the court needs to do is go through all of the reasons given for the adverse credibility, discount any that are factually or legally erroneous, and then you see what's left. Kumar also said that credibility factors are not all created equal and you have to weight the probative value of whatever's left and see if that might be sufficient to discount his consistent and corroborated testimony past torture. So if you find that any of the adverse credibility factors survive, you must at least remand. But depending on which factors you find do survive appellate review, you may not need to because the IJ conceded that none of the factors on their own would be sufficient and the board found specific factors like his alias and used false documents are less significant and specific inconsistencies about how many times he crossed drugs or how many arrests also would be insufficient for adverse credibility under this circuit. And with that, I will save the rest of my time for rebuttal. Thank you. Good morning, Ms. Juarez. Good morning. May it please the court, Anna Juarez for Respondent Attorney General. The issue here is whether Petitioner met his burden to establish eligibility for deferral of removal under the Convention Against Torture, which is a very high burden. He needs to show that the intentional infliction of severe harm would occur to him and he needs to show that it was particularized and he would be singled out for torture. He also had the burden to establish with credible evidence that there's a clear probability that he would be tortured. Here, the agency considered the totality of the circumstances, which it's supposed to do. It's allowed to look at any relevant factor. And so it very carefully laid out many different reasons for its adverse credibility finding. It was honest that none of them would support it on its own, and this court's case law wouldn't allow that anyway under LOM. But it doesn't—not one needs to support it alone, and it's looking at the totality of the circumstances. And this course in La La Land has also allowed the agency to use common sense. And so looking at this petitioner's story and just the repeated use of deception and inconsistencies and all of these different stories and kind of all of these different patterns throughout his immigration history, he's used false aliases, false documents, a false claim to citizenship, which this court has said is appropriate for an adverse credibility finding in Garcia. Ms. Juarez, this is a very complicated case, as we all know. Abundance of a large record. It seems as if the agency gave quite a bit of credence to statements that he made at the border in 2014 and 2015 and then as I noted in my question to Ms. Bradley, that the analysis didn't seem to encompass the fact that he attempted suicide right after those statements. In your view, should the board have considered his mental health diagnosis, that he was going through a mental health crisis event, in determining the reliability of those statements or in weighing them relative to what he testified to afterwards? Yes, Your Honor, and a few different responses to that. The statements and stating that he had no fear when he entered in 2014 and 2015 are part of the entire totality of the circumstances. There's no record evidence that those first two instances that he had mental health concerns. There's the mental health records in the record, the objective evidence. There's a record that DHS submitted in August 2015 that stated he's suicidal at that time. It didn't report any past mental health issues. It stated he was alert at that time and oriented a person, place, and time. If I remember correctly, and you may correct me if I'm wrong, but I thought that after his August 2015 suicidal episode, he was given an interview and he mentioned that he had attempted suicide multiple times in the past. There's testimony that he swallowed a pill of something after visiting the military checkpoint in June of 2015. It seemed as if there was record evidence of multiple suicide attempts. Right, and that was his claim, and again, this is all not credible evidence here. So just looking at what objective evidence we have in the record, we have the DHS's interview that was in 2016 that stated it noted him taking all of the medication that started this incompetency hearing and the stay in the hospital. He also submitted a report from a psychologist from 2016 which also stated, and it was just based on the interview with him, that his history was generalized anxiety disorder, but not necessarily like a long pattern of mental health. That would explain all of these inconsistencies. I mean, are we going in circles a little bit, though? If we're saying it's incredible, but apparently there was enough there to give him counsel because he was incompetent and he did attempt suicide and was in a psychiatric hospital for a month and a half, there's some corroborating evidence that he was suffering through something, right? Yes, Your Honor, yes, and another part of my response to that is the agency did consider it. DHS, and kind of backing up, DHS alerted the immigration judge. This person has had a reinstated removal order repeatedly throughout his immigration history. This time, DHS gave him a notice to appear, which allowed him to have full removal proceedings before an immigration judge, which he hadn't had in his multiple other allele entries into the United States. So he had the full removal hearings. The immigration judge gave him the competency hearing. During it, he said he was medicated and feeling well. The immigration judge gave him counsel and an abundance of caution. The immigration judge, at 7-10 in the record, it's her first immigration decision, the one that got remanded, and in relation to credibility, she carefully went through why it didn't affect his credibility determination. He'd been coherent. He testified, you know, throughout proceedings and that the issue wasn't, it didn't seem to be related to a mental health issue, and so she analyzed it, and then she incorporated that finding in her most recent decision. And also at 1-34 in the record, I believe it's in the context of the forced institutionalization, but she also kind of went through her findings about his competence, how he had testified, you know, very clearly and coherently about his case during removal proceedings. I would like you to respond to Ms. Bradley's argument about the expert witness, in which she said that, you know, basically the judge credited the report and the testimony, but then didn't say anything in the record that contradicted or was really a factual basis to reject his opinion. Yes, Your Honor. And this case is distinguishable from Valeska's Samayoya, which counsel relied on. In that case, they gave the expert full evidentiary weight and just found that the record didn't corroborate it. Here, the agency carefully went through. They credited him as a witness to drug trafficking and the movement of people. The immigration judge went through and gave weight to certain testimony. In particular, the expert's familiarity with he'll probably be at some risk because he does have tattoos, he'll be noticeable to cartels and authorities. That's all the same as the generalized record evidence that the agency found did not meet the burden. And the agency credited that part of the expert's testimony. The part that it didn't credit was the part that was specific to the petitioner here. First of all, it was based on the same not credible story. And it was based, the nonprobative part, it was based on a one- to two-hour interview with a person that counsel said doesn't trust people to share his story. So the part that the agency didn't agree with was the expert's opinion, which he's welcome to give. But his declaration that it's more likely than not that this person would be tortured for these reasons, that's not a witness's determination to make. And to the extent that he's concluding something about this particular petitioner is what didn't, the agency doesn't have to agree with it, that's the agency's call to make. But to the extent that it's the generalized evidence, he is at some risk based on these factors, that's what was credited. You would concede, though, that at one point his foot was set on fire and, you know, he was tortured in the prison and so on. That is, the tattoos is another one that, you know, this man sort of seems to fit the profile that Mr. Slade, I forgot his name, Slack, Dr. Slack is describing. It, well, whether his foot was burned, again, that's part of his testimony that wasn't accepted as credible. And yes, there is record evidence, including Dr. Slack's testimony, that there's harm, there's discrimination. The agency looked at all of the record evidence, though. There's also record evidence that the inquisitorial system is changing and that there's less torture. There's movements out there to destigmatize tattoos. There's, the tattoos are a visual marker, so it, I mean, no one is claiming that there's zero risk. But the problem is there's not a clear probability that he would be tortured and singled out for torture. And I'd like to address the aggregation of risk, too, unless there's any other questions. The agency did it appropriately here, both before and after Velasquez-Tamayoya. The immigration judge used JFF, which this court has upheld the use of. The immigration judge noted these hypothetical chains, which JFF does for each one. The immigration judge then went through the record evidence and made a conclusion about whether the record evidence showed more likely than not the ultimate conclusion, whether the authorities would torture him, whether the cartels would. And the agency, although it listed these chains, it didn't get hung up on an unnecessary link, which counsel is claiming. So your view is that the immigration judge didn't make a determination that each individual link had to be over 50%? Correct. The immigration judge went through each one, which has been upheld by this court. And that's how the immigration judge has to look at all these different claims and sources and used a framework that's been approved. And the immigration judge multiple times, I believe at AR 124, 126, 135, 136, said, after I do this individual analysis, then I need to look at the aggregate risk. I need to look at them all together. The immigration judge also noted it's a bit hard and it would make sense if I could assign a percentage to each, but that would be arbitrary if I did that. So what I need to do is look at the entire record evidence and see if all these sources would result in the clear probability of his torture. And that's what case law has upheld. There's no circuit courts that have held that it should be a quantifiable adding different percentages. So the agency did all that it could with all of this record evidence, all the different claims. It walked through it as clearly as it could and added it together. And I'm happy to answer any other questions then. I know there is a lot going on in this case. All right. Thank you. Thank you very much. Thank you, Your Honors. So a few things on credibility to go back to some questions we had about his border interviews. Here, because the immigration judge and the board misstated the record, mischaracterized his testimony, speculated about how officials should act, and specifically because they refused to consider his reasonable explanation for what they saw as implausibilities under CHOWLA, that prevents those factors from being supported by substantial evidence. Those have to be kicked out under CHOWLA, because for the 2014, there was a transcription error, which then the IJ used to engage a speculative journey, what would have happened if he had been shot in the face, which he never was. And she never gave him the opportunity to clarify her misunderstanding. And that prevents that interview and any findings about it from being supported by substantial evidence for adverse credibility. Both the board and the government acknowledged the immigration judge made this misstatement, made this error, yet still encouraged the court to uphold the findings about the July 2014. In the 2015 border interviews, the failure to consider his mental health as an explanation for some inconsistencies or possibilities also prevents that factor from being used as substantial evidence in support of the adverse credibility finding. And so what you do in CUMAR, you go through every single one, say, are there legal errors, are there factual errors, was there misstatements, was there speculation, that was based on just speculation instead of evidence, and if you take out all of the ones that don't stand up, and then you see what's left. If none of the factors are sufficient, and again, the judge and board both said that none of the factors on their own would be okay, so if you only have one or two left, they've already kind of said, depending on which factors, that would not be sufficient to discount his consistent and detailed and corroborated testimony of past torture. So if you find Mr. Viem credible, that essentially resolves this case. The immigration judge already found that if credible, she would find he suffered past torture. The agency already found that if credible, his testimony alone is sufficient to find acquiescence to the Sinaloa cartel torture. If credible, Dr. Slack's testimony is bolstered even further. And while Nuru says that a past torture does not create a rebuttable presumption of future torture, it is generally the strongest indicator of what's likely to happen in the future. But even if you don't find Mr. Viem credible, don't want to credit what he said, the record still compels concluding he will be tortured in the future based on objective evidence alone. U.S. criminal records and ICE records show that when he was deported in 2009, he was covered in tattoos. Mexican criminal records show that he was in this prison for four years in Aquiles, Sardin. News reports show that federal police came and stripped and whipped people indiscriminately. But also country conditions show he contains every single characteristic of which makes people's torture more likely. The State Department, UN, Amnesty International all show that people who are perceived to be criminals or organized crime, those are the most likely victims of the widespread torture that happens in Mexico. The Tijuana study found that having a deportation history and criminal history and having six or more tattoos makes it statistically more likely that someone will be tortured or abused by Mexican officials. Field reports and the expert testimony show how police and cartels routinely strip and violently interrogate individuals who are deported and have what seems to be prison tattoos. And the State Department, IACHR, and Amnesty also talk about how people who are mentally ill, have indigenous descent, and are lower socioeconomic strata are also at higher risk of torture and trafficking. So you're now well over time. I am. If you want to just wrap up, please. Yeah. It was based on the subjective characteristics that Dr. Slack found that his torture by cartels, even if you discount his testimony, is extremely likely and his future torture by police, sorry, police is extremely likely and by cartels is highly likely. Thank you. Thank you very much. Next case.
judges: BADE, SANCHEZ, Lefkow